# In the United States Court of Federal Claims

No. 21-1489
(Filed: February 27, 2026)

```
* * * * * * * * * * * * * * * * *
                                *
DONALD E. BEDWELL, et al.,      *
                                *
                  Plaintiffs,   *
                                *
      v.                        *
                                *
THE UNITED STATES,              *
                                *
                  Defendant.    *
                                *
* * * * * * * * * * * * * * * * *
```

*Thomas S. Stewart*, with whom were *Reed W. Ripley* and *Steven M. Wald*, Stewart, Wald & Smith, LLC, of Kansas City, MO, for Plaintiffs.

*Christopher M. Chellis*, Trial Attorney, with whom were *Matthew P. Rand*, Trial Attorney, *David A. Harrington*, Assistant Chief, Natural Resources Section, and *Adam R.F. Gustafson*, Acting Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, all of Washington, D.C., for Defendant.

## ORDER AND OPINION

**SOMERS**, Judge.

At issue in this case is the conversion of a former rail corridor in rural Indiana from use as a railway to a recreational trail open to the public for hiking and biking purposes. The parties agree that the conversion of the rail corridor constitutes a taking under the Fifth Amendment to the U.S. Constitution; therefore, the issue at trial was the amount of just compensation Plaintiffs are owed for this taking.

Plaintiffs, various landowners whose properties abut the rail corridor, argue that they are entitled to just compensation for both (1) the land actually taken by the government to build the recreational trail and (2) the construction of fencing, which they allege is the cost to cure the diminution in value to their remaining parcels caused by security and privacy concerns created by the newly repurposed corridor. The government disputes the amount of just compensation owed for the taking of Plaintiffs' reversionary interest in the land they own under the rail corridor, arguing that Plaintiffs' appraisal methodology is flawed because it assumes a fee simple taking, even though Plaintiffs can allegedly still make use of the land taken within the rail corridor. Additionally, the government argues that Plaintiffs are not entitled to compensation for

the cost to cure because they have failed to make the prerequisite showing necessary for such recovery.

As discussed in detail below, the Court concludes that, because Plaintiffs' methodology for calculating just compensation is sound and the government presented no meaningful evidence to the contrary, Plaintiffs are entitled to the full amount alleged as just compensation for the taking of their revisionary interests. However, because Plaintiffs have failed to establish that the cost to cure would be less than the diminution in value to the remainder of their properties, Plaintiffs may not recover the cost to cure.

## FINDINGS OF FACT[1]

On April 21, 2021, the Indiana Railroad Company ("INDR") filed a Verified Notice of Exemption under 49 C.F.R. § 1152.50 to abandon an approximately 5.92-mile rail line known as the Riley Spur in Vigo County, Indiana. ECF No. 75 ¶ 1; JX 1 at STB 1. The Riley Spur runs "just north of Honey Creek east southeast towards and through the town of Riley, [Indiana]," following the Wabash and Erie Canal through a rural portion of the state. JX 1 at STB 26. The spur extends from milepost 6.48 to the end of the track at milepost 12.4 near Riley, ECF No. 75 ¶ 7, and carries a right-of-way easement, which varies between 30 and 50 feet wide from the centerline track in both directions, in total encompassing between 60 and 100 feet, JX 1 at STB 26. Put simply, the easement that constitutes the Riley Spur rail corridor is approximately 5.92 miles in length and varies between 60 and 100 feet in width.

On May 5, 2021, INDR filed a Supplemental Notice of Exemption with the United States Surface Transportation Board ("STB"), including a certification that the rail line meets the criteria set forth in 49 C.F.R. § 1152.50(b) because no local freight traffic had moved over INDR's 5.92-mile rail line for two years and any overhead traffic could be rerouted over other lines. ECF No. 75 ¶ 2; JX 2 at STB 132. On May 19, 2021, the Board of Commissioners for Vigo County, Indiana ("the board") filed a Trail Use Request ("TUR") and a Statement of Willingness to assume financial responsibility for the proposed trail. ECF No. 75 ¶ 5; JX 5. The board stated in the TUR that "in order to establish interim trail use and rail banking under 16 U.S.C. § 1247(d), and 49 C.F.R. § 1152.29, Vigo County is willing to assume full responsibility for management of, for any legal liability arising out of the transfer or use of, and for the payment of any and all taxes that may be levied or assessed against the right-of-way owned and operated by Indiana Railroad Company." ECF No. 75 ¶ 5; JX 5 at STB 156.

On June 9, 2021, the STB issued a Notice of Interim Trail Use or Abandonment ("NITU"), effectively transferring the rail line from INDR for railroad purposes to Vigo County to construct a recreational trail under the National Trails System Act, 16 U.S.C. § 1247(d). ECF No. 75 ¶ 6; JX 8. That year, Plaintiffs brought suit seeking just compensation for the partial taking of fourteen railway-adjacent properties by the conversion of the railway to a recreational

---

[1] The recitation of facts in this opinion constitutes the Court's principal findings of fact in accord with Rule 52(a) of the Rules of the U.S. Court of Federal Claims ("RCFC"). This introductory synopsis of facts should be coupled with the more extensive findings of fact and rulings on questions of mixed fact and law set out in the Court's analysis.

trail. *See* ECF No. 8. Eight of those plaintiffs accepted offers of judgment, leaving for trial five Plaintiffs who own the six properties still at issue. *See* ECF Nos. 72–73. The plaintiffs that remain are Newman Co., Inc. ("Newman Co."), Bonny Orchards, Inc. ("Bonny Orchards"), Richard Card III, Patricia Stewart, and American Legion Charles Raymond Fagg Post #328 ("American Legion"). *See* ECF No. 75.

Newman Co. owns two adjacent parcels that abut the recreational trail. *Id.* ¶ 29. Both parcels are located on S State Road 46 in Terre Haute, Indiana, JX 27 at PLT 59, 108, and the size of the two parcels is 4.202 acres, ECF No. 75 ¶ 32. Newman Co.'s first parcel, Parcel No. 84-10-16-377-004.000-018, contains a storage facility. ECF No. 75 ¶ 26; JX 27 at PLT 82–83; ECF No. 108 at 23:25–24:4. The parcel is zoned commercial and used for that purpose. JX 27 at PLT 108. The storage unit parcel totaled 1.006 acres before the taking and 0.900 acres after the taking; therefore, the government effected a taking of 0.106 acres. *Id.* Newman Co.'s remaining storage unit property abuts the trail for a total length of 92 linear feet. *Id.*

Newman Co.'s second parcel, Parcel No. 84-10-16-377-006.000-018, contains a strip mall, which houses various commercial tenants, including a dollar store, a restaurant, a martial arts studio, and a logistics company. ECF No. 75 ¶ 26; JX 27 at PLT 59–60. The parcel is zoned commercial and used for that purpose. JX 27 at PLT 59; ECF No. 108 at 69:4–6. The strip mall parcel totaled 3.196 acres before the taking and 2.88 acres after the taking. JX 27 at PLT 59. Thus, the government's taking of Newman Co.'s strip mall parcel totals 0.316 acres. Newman Co.'s remaining strip mall property abuts the trail for a total length of 275 linear feet. *Id.* at PLT 77.

Bonny Orchards' parcel, Parcel No. 84-09-13-400-026.000-003, is located on McDaniel Road in Terre Haute, Indiana. ECF No. 75 ¶ 8; JX 26 at PLT 48. The parcel is zoned agricultural and used for that purpose. JX 26 at PLT 48. Before the taking, Bonny Orchards' parcel was 35.395 acres and now, after the taking, is 32.64 acres, resulting in a 2.755 acre taking by the government. *Id.* Bonny Orchards' remaining property abuts the trail for a total length of 2,400 linear feet. *Id.*

Mr. Card's parcel, Parcel No. 84-10-16-351-005.000-018, is located on E Gross Drive in Terre Haute, Indiana. ECF No. 75 ¶ 33; JX 26 at PLT 51. The parcel is zoned agricultural but is used for residential purposes. JX 26 at PLT 51. Before the taking, Mr. Card's parcel amounted to 28.332 acres and is now 26.910 acres following the government's taking of 1.422 acres. *Id.* Mr. Card's remaining property abuts the trail for a total length of 1,239 linear feet. *Id.*

Ms. Stewart's parcel, Parcel No. 84-10-17-200-010.000-018, is located on S Lama Street in Terre Haute, Indiana. ECF No. 75 ¶ 18; JX 26 at PLT 7. The parcel is zoned agricultural but is used for residential purposes. JX 26 at PLT 7. Ms. Stewart's parcel totaled 23.188 acres before the taking and is now 20.76 acres post-taking, resulting in a 2.428 acre taking by the government. *Id.* Ms. Stewart's remaining property abuts the trail for 2,115 linear feet. *Id.* at PLT 26.

3

The American Legion's parcel, Parcel Nos. 84-10-17-200-007.000-018 and 84-10-17-100-005.000-018,[2] is located on S Lama Street in Terre Haute, Indiana.  ECF No. 75 ¶ 13; JX 26 at PLT 49.  The parcel is zoned agricultural but is used for recreational purposes.  JX 26 at PLT 49.  Before the taking, the American Legion's parcel amounted to 112.829 acres and is now 110.27 acres; a 2.559 acre taking by the government.  *Id.*  The American Legion's remaining property abuts the trail for a total length of 2,229 linear feet.  *Id.*

## A.    Testimony of Todd Newman

At trial, Plaintiffs called Mr. Todd Newman, the owner of Newman Co., to testify on behalf of the company.  Mr. Newman explained that the company specializes in residential remodeling and owns several investment properties, two of which are the storage unit and strip mall parcels at issue here.  ECF No. 108 at 23:4–12, 24:3–20, 27:21–25 (Newman).

Newman Co. purchased the storage unit parcel in 2002.  *Id.* at 24:14–17.  At that time, the facility consisted of 68 units until Newman Co. expanded the facility by adding 24 more units in 2004.  *Id.* at 24:14–20.  Mr. Newman testified that individual storage units within the facility are commercially available and that customers who entrust Newman Co. with their belongings expect the facility to be secured.  *Id.* at 38:21–39:6.  For this reason, Mr. Newman fenced the perimeter of the storage unit facility and installed outdoor security lighting soon after purchasing the property.  *Id.* at 28:15–20.  According to Mr. Newman, the rail corridor sits about 55 feet from the back of the storage unit facility.  *Id.* at 29:25–30:6.

Newman Co. purchased the strip mall parcel in 2010.  *Id.* at 27:24–28:1.  Mr. Newman testified that the strip mall parcel houses five commercial tenants and has a parking lot in the front of the property facing S State Road and a concrete platform in the back for access to dumpsters and the rear of the property.  *See id.* at 28:21–29:4, 30:10–18.  Behind the concrete platform sits a retention pond and the rail corridor.  *Id.* at 30:10–18.

According to Mr. Newman, the rail corridor was mostly used for parking trains in 2002 and, by 2010, was inactive.  *Id.* at 29:9–17.  Before construction of the recreational trail, the corridor was not maintained and was mostly overgrown with trees and brush.  *Id.* at 29:21–24.  Mr. Newman first learned of plans to convert the rail corridor into a recreational trail at public meetings and by reading the news.  *Id.* at 30:19–31:2.  The county's plan to build a recreational trail came as a disappointment to Mr. Newman, who planned to use the property that sits in the corridor for various business purposes.  *Id.* at 31:17–19.  Mr. Newman testified that he had been trying to acquire the corridor property next to his storage unit parcel for six years to expand the storage unit facility.  *Id.* at 31:22–32:9.  Had he acquired such property, Mr. Newman would have expanded the facility by 50 feet, thereby allowing him to add approximately 10 more storage units, which he could lease for $12,000 to $15,000 each, totaling up to $150,000 of extra revenue on the storage unit parcel.  *Id.*  Mr. Newman also had plans to improve the strip mall parcel by

---

[2] Although the American Legion technically owns two parcels affected by the trail easement, the Court refers to the American Legion's parcels in the singular because the parcels abut and are treated by the parties, for all intents and purposes, as one single larger parcel.

4

adding additional storage at the back of the building to accommodate requests from his tenants for extra storage for commercial inventory. *Id.* at 35:25–36:10.

In addition to expressing displeasure with the impediment to his business expansion plans, Mr. Newman also stated that he was concerned with the security, liability, and privacy implications of converting the abandoned rail corridor into a recreational trail. Regarding security, Mr. Newman testified to incidents that predate construction of the trail but nonetheless raise concerns for his parcels. Mr. Newman recounted that the dollar store located on the strip mall parcel was robbed at gunpoint by individuals who accessed the property from, and fled the scene via, the abandoned rail corridor. *Id.* at 36:24–37:2. Mr. Newman also testified to issues with vagrant trespassers who established encampments behind the strip mall parcel after accessing the property via the abandoned rail corridor. *Id.* at 49:14–19. Additionally, Mr. Newman stated that a house neighboring Newman Co.'s properties was hit by bullets fired from the rail corridor, *id.* at 49:20–50:11, and that there have been multiple incidents of trespassing behind and onto the storage unit facility by individuals walking along the rail corridor, *id.* at 36:14–23.

Although these security issues arose before construction of the trail, Mr. Newman testified that converting the rail corridor to a recreational trail would only amplify his concerns, as a recreational trail would afford robbers greater opportunities to target the strip mall's tenants. *See id.* at 37:3–18, 48:17–49:5. Specifically, Mr. Newman fears that an evenly paved and highly accessible recreational trail would allow robbers to bring motor vehicles right up to the rear property line, allowing for quicker ingress and egress than proceeding on foot in an overgrown and unkempt abandoned rail corridor. *Id.* at 48:17–49:5. Mr. Newman also stated that patrons of the recreational trail often wander off the trail and onto his parcels, either on foot or with motorized vehicles, such as ATVs. *Id.* at 37:3–18.

Regarding liability, Mr. Newman explained that, because his parcels sit between a major roadway and the recreational trail, unauthorized individuals park at the strip mall and walk around the building to access the recreational trail at the rear of the parcel. *See id.* at 46:6–12; 77:8–20. This is of concern to Mr. Newman because, to access the recreational trail from the parking lot, people must walk over an uneven open-grass field with no handrails, lights, or pavement. *Id.* at 38:4–12. In Mr. Newman's opinion, such conditions could expose Newman Co. to liability should a person fall and get injured on this walk. *Id.* at 38:9–12. In fact, Mr. Newman stated that he has had three to four claims filed against his insurance for this exact type of injury. *Id.* at 38:1–4. As for privacy concerns, beyond trespassing, Mr. Newman worries that when foliage between the recreational trail and his parcels is sparse during the winter, individuals on the trail will have a clear view into his parcels. *See id.* at 44:13–45:16.

Mr. Newman does not believe that the ditch and foliage between the recreational trail and his parcels sufficiently mitigate his security, liability, and privacy concerns; instead, he believes that installing fencing would ameliorate these concerns. According to Mr. Newman, when Newman Co. purchased the storage unit parcel in 2002, the parcel did not have any fencing. *Id.* at 38:17–20. To better secure the storage unit facility, Mr. Newman installed a six-foot chain link fence with three strands of barbed wire that year. *Id.* at 38:21–39:1. After hearing about the county's plans to construct the trail, Mr. Newman constructed a ten-foot-tall, ten-inch-thick

5

concrete wall across the entirety of the rear of the storage unit property and the rail corridor. *Id.* at 39:15–40:2.

Like the storage unit parcel, the strip mall parcel did not have fencing at the time Newman Co. purchased it in 2010. *Id.* at 40:10–15. Prior to construction of the trail, Mr. Newman testified that he was going to build a fence, similar to the one constructed on the storage unit parcel, to block trespassing ATV motorists from accessing the strip mall parcel from the rail corridor and vice versa. *See id.* at 44:25–45:16. The county attempted to assist Mr. Newman with this issue by dumping abandoned railroad ties to impede the point from which the ATV motorists accessed Newman Co.'s parcels. *Id.* at 64:21–65:2. In response, the motorists simply drove their ATVs and other vehicles five feet over from where the county laid the railroad ties, thereby circumventing the makeshift roadblock and continually accessing Newman Co.'s parcels. *Id.*

Eventually, Mr. Newman received a call from a county commissioner seeking to build a fence to impede motorist access to the then-completed recreational trail. Specifically, the county commissioner sought the contact information of the gas company that owns a gas line service easement on Newman Co.'s parcels for permission to build a fence because that fence could potentially impede the gas company's access to its gas lines.[3] *Id.* at 43:5–12. Mr. Newman provided the county commissioner with the contact information and heard nothing more regarding the fencing project. *See id.* at 43:11–12. Sometime later, the county constructed a four-foot-tall chain link fence that covers approximately 60 feet of the 275-foot border of the rear of the strip mall parcel and the recreational trail. *Id.* at 42:18–43:1, 43:20–24, 44:7–13; *see also id.* at 118:25–119:1. However, the county-constructed fence had an intentionally-designed three-foot gap to allow for pedestrians to pass through. *Id.* at 46:6–12. Mr. Newman testified that he never consented to the county's construction of this fence, *id.* at 43:2–12, and that the county-constructed fence does not quell the security, liability, or privacy concerns he has with the recreational trail, *id.* at 46:6–19.

## B.    Testimony of Lawrence Robbins

After Plaintiffs rested their case, the government called its first and only witness, and the only other fact witness of the trial, Mr. Lawrence Robbins, to testify in his capacity as Vigo County Engineer. *See* ECF No. 109 at 288:24–25 (Robbins). Mr. Robbins stated that in this position, he manages all capital projects for Vigo County, including bridges, roads, and recreational trails. *See id.* at 289:7–290:16.

As County Engineer, Mr. Robbins oversaw the design, construction, and implementation of the Riley Spur trail, the recreational trail at issue here. *Id.* at 290:13–16. Mr. Robbins explained that the Riley Spur project consists of three phases. Phase one runs from the town of

---

[3] Although the storage unit and strip mall parcels are adjacent to one another, they are bisected at their shared property line by two ten-inch underground gas lines that are serviced by a local gas company through an easement. ECF No. 108 at 40:22–41:6 (Newman). The gas lines eventually part with the shared property line and move diagonally across the strip mall parcel toward the former rail corridor. *Id.*

Riley, Indiana westward to a crossroad on the abandoned rail spur, and phase two continues the trail beyond that same crossroad westward to Terre Haute, Indiana. *Id.* at 290:25–291:19. As of the date of trial, phase two was awaiting approval for construction from the Indiana Department of Natural Resources and phase three had not begun construction. *Id.* at 291:20–292:12. Mr. Robbins stated that he assisted with the land acquisition of the rail corridor for railbanking and trail use and personally designed phase one. *Id.* at 292:13–23.

Mr. Robbins then testified to the specifics of the trail, trail safety, county policies regarding adjacent landowner use of the rail corridor, and fencing. Regarding the specifics of the trail, Mr. Robbins testified that the trail is a 10-foot-wide paved surface with two-foot stone shoulders on either side, making the overall width of the paved trail fourteen feet. *Id.* at 293:17–25. The railroad corridor in which the trail is located is generally 100 feet wide, extending 50 feet from the centerline of the railbed on each side. *Id.* at 294:1–6. The centerline of the railbed both serves as the property line between Plaintiffs' parcels and bisects the paved trail. *Id.* Therefore, although the paved trail itself is fourteen feet wide, it only protrudes seven feet into each adjacent parcel. *See id.*

Regarding trail safety, Mr. Robbins stated that any safety concerns or incidents on the recreational trail would be directed to his attention by the Vigo County commissioners. *Id.* at 296:2–6. Mr. Robbins testified that he is not aware of any crimes committed and has only received formal notice of one safety concern involving a bike accident on the trail. *Id.* at 296:15–297:1. However, Mr. Robbins stated that there were instances of unauthorized vehicles, like ATVs, accessing the trail. *Id.* at 297:2–9. Specifically, Mr. Robbins stated that a county commissioner notified him of unauthorized ATV access to the trail via one of Newman Co.'s properties. *Id.* at 312:15–312:24. After investigating the issue at the county commissioner's request, Mr. Robbins had a crew place concrete blocks at crossroads intersecting the trail to prevent motor vehicle access and abandoned railroad ties on the path connecting the trail to the rear of Newman Co.'s property as a temporary solution. *Id.* at 312:21–313:19, 313:25–314:5. For a permanent solution, Mr. Robbins hired a contractor to build a chain link fence to prevent vehicular access from the Newman Co. property to the recreational trail and vice versa. *Id.* at 315:4–19. Mr. Robbins stated that the fence has a locked gate to allow the gas company to service the gas lines on Newman Co.'s property and a three-foot gap in the fence to impede vehicular—but not pedestrian—access because "we want pedestrian access [to the trail] as much as we can up and down the corridor." *Id.* at 317:6–318:3. Mr. Robbins stated that, if Mr. Newman requested that this fencing gap be closed, the county would do so at its own expense. *Id.* at 318:10–14.

Regarding adjacent landowner use of the rail corridor, Mr. Robbins stated that it was Vigo County's policy to treat a railway easement like a road right-of-way. *Id.* at 337:8–11. For a road right-of-way, the county essentially maintains the road and adjacent drainage ditches and leaves the remaining property in the right-of-way to be maintained by an adjacent landowner. *Id.* at 337:11–25. Here, Mr. Robbins stated that the county would similarly maintain the recreational trail and the land immediately adjacent to it, while leaving the remaining land in the corridor to be maintained by adjacent landowners. *Id.* According to Mr. Robbins, this policy essentially allows "individuals' yards [to] extend" into the corridor, allowing them to utilize part of the corridor as they would their own backyard. *See id.* at 337:17–19, 337:23–25. Thus, Mr. Robbins

7

stated that adjacent landowners can trim trees, mow the grass, garden, or host a cookout in the rail corridor. *Id.* at 343:2–3, 344:5–9.

Regarding fencing, Mr. Robbins testified that the county would provide fencing to those who request it. *See id.* at 318:10–14, 324:6–8. He explained what he considered to be an official request—a request in writing for fencing installation—and an unofficial request—a verbal request at a county meeting. *Id.* at 320:20–321:11. As of the date of trial, Mr. Robbins stated that the county had yet to receive an official fencing request from any Plaintiff or other affected landowner.[4] *Id.* at 319:4–6 (no fencing request from Bonny Orchards), 319:14–16 (no fencing request from American Legion),[5] 320:3–5 (no fencing request from Ms. Stewart), 320:14–16 (no fencing request from Mr. Card); *see id.* at 318:10–12 (no fencing request from Newman Co.). However, in contradictory fashion, Mr. Robbins also stated that the county has yet to establish an official method for landowners affected by the trail to specifically request fencing. *Id.* at 303:17–304:8. Instead, according to Mr. Robbins, landowners can request fencing by filing a complaint on the county website designated for general requests to service local issues, such as pothole repairs. *Id.* at 321:12–322:7.

## DISCUSSION

### A.    Standard of Review

#### 1.    Just Compensation

The Tucker Act grants this Court jurisdiction to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). In other words, the Tucker Act "waives sovereign immunity and provides jurisdiction . . . where there is a [federal] money-mandating provision on which the plaintiff may base its recovery." *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009). "The Fifth Amendment is a money-mandating provision upon which plaintiffs may seek damages against the government under the Tucker Act." *Sears v. United States*, 132 Fed. Cl. 6, 10–11 (2017) (citing *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 11–12 (1990)).

---

[4] In addition to asking whether the county received "official" or "unofficial" requests, government counsel asked Mr. Robbins whether the county had received fencing requests under Indiana Code 8-4.5-6-6. ECF No. 109 at 349:2–6, 350:22–23 (Robbins). Mr. Robbins replied in the negative. *Id.* at 351:4–8.

[5] Mr. Robbins testified that, although he received no "official" fencing request from the American Legion, he did receive an "unofficial request" from the American Legion to build fencing. Specifically, Mr. Robbins stated that American Legion representatives expressed in a public meeting that they wanted fencing installed on their properties. ECF No. 109 at 319:14–21 (Robbins). As of the date of trial, the county had not installed any fencing on the American Legion's property despite this "unofficial" request. *Id.* at 360:20–23. This is because, according to Mr. Robbins, the portion of the trail that borders the American Legion's property has not yet been constructed. *Id.*

8

Under the Just Compensation Clause of the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.  To be justly compensated for the taking of private property, a landowner is entitled "to be put in as good a position pecuniarily as if his property had not been taken." *Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)).  In other words, the landowner must be "made whole." *Id.*  To be "made whole," a landowner subject to a taking receives the fair market value of the property taken, defined as "'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Cntys.*, 441 U.S. 506, 511 (1979) (quoting *United States v. Miller*, 317 U.S. 369, 374 (1943)).

"It is settled law" that a Fifth Amendment taking occurs in rails-to-trails cases "when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010).  Such a taking begins on the date of the issuance of a NITU. *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006).  If the government takes a landowner's property in the form of an easement, the "'conventional' method of valuation is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed.'" *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012) (quoting *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632 (1961)).

### 2.    Cost to Cure

Once a plaintiff establishes that a taking has occurred, he is entitled to compensation for his "costs in preventing the damage caused by government actions." *Vaizburd v. United States*, 384 F.3d 1278, 1286 (Fed. Cir. 2004).  Thus, in addition to the value of the property actually taken by destroying a plaintiff's reversionary interest, just compensation can include severance damages, which constitute "the diminution in value in the owner's remaining property resulting from the taking." *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) (citing *Miller*, 317 U.S. at 376).  "The cost to cure—or the cost of mitigating damages caused by the taking—provides an alternative means of quantifying severance damages." *Id.*  For example, if a landowner owns a ten-acre parcel and the government takes one acre to build a recreational trail, the government must compensate the landowner for both the one acre taken and any resulting diminution in value to the remaining nine acres. *See Hardy v. United States*, 141 Fed. Cl 1, 44–48 (2018) (awarding the cost to install fencing to mitigate compromises of security and privacy to the remainder caused by a partial government taking to build a recreational trail).

However, to recover the cost to cure, a plaintiff must establish that "the cost of curing the injury to the remainder is less than the outright diminution in its value uncured . . . ." *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614 (quoting *United States v. 2.33 Acres of Land*, 704 F.2d 728, 730 (4th Cir. 1983)).  In other words, a plaintiff may only recover the cost to cure in instance in which "the actual cost to cure is less than or equal to the diminution in value of the remainder, such that evidence of the cost to cure is admissible only when the cost to cure is no greater than the diminution in value of the remainder if the condition is left uncured." *Id.* (quoting 4A JULIUS

L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 14A.04[2][a] (3d ed. 2013)).  Therefore, to extend the example above, the landowner may only recover the cost to cure the diminution in value of his remaining nine acres if the cost to cure such diminution is less than or equal to the diminution itself.

**B.    Analysis**

Plaintiffs claim that they are entitled to two different types of monetary damages to justly compensate them for the government's taking.  First, Plaintiffs state they are entitled to just compensation for the physical occupation of their parcels by the recreational trail because that occupation takes all, or almost all, of the beneficial use of those portions of their parcels.  Second, Plaintiffs seek the cost to cure the impact of the recreational trail on the remainder of their parcels.  The Court first discusses the just compensation owed to Plaintiffs for the physical occupation of their land before addressing whether Plaintiffs are entitled to just compensation for the cost to cure.

> **1.    Occupation of Plaintiffs' Property by the Recreational Trail**

At trial, Plaintiffs' expert witnesses testified to their methodologies in calculating just compensation, the total acreage of property taken by the government, and the destruction of Plaintiffs' right to exclude on the property taken.  The Court addresses each subject of expert testimony in the order presented.

> > **a.    The Court adopts Plaintiffs' appraisal methodologies and just compensation figures as Plaintiffs met their burden of proof and the government failed to discredit Plaintiffs' experts and their findings**.

Plaintiffs presented two experts at trial.  First, Plaintiffs called Luke Nordine, a member of the Appraisal Institute ("MAI"),[6] of David Matthews Associates, to explain the amount of compensation owed to Plaintiffs for the land taken and the methodology for computing that figure.  Next, Plaintiffs called David Matthews, MAI,[7] also of David Matthews Associates, to explain appraisal methodology in rails-to-trails cases generally.

___

[6] Mr. Nordine has a bachelor's degree in business administration from the University of Evansville and holds several real estate appraisal certifications and licenses.  JX 26 at PLT 45; JX 27 at PLT 104.  He is the vice president and owner of David Matthews Associates, which performs real estate appraisal services for a variety of corporate and governmental clients.  *See* JX 26 at PLT 45; JX 27 at PLT 104; ECF No. 108 at 234:9–14 (Mr. Matthews discussing the variety of clients their company has had); *see also About Us*, DAVID MATTHEWS ASSOCIATES INC., https://davidmatthews-assoc.com (last visited Feb. 24, 2026).  The Court accepted Mr. Nordine as an expert in the valuation of the rail corridor and properties at issue in this case.  ECF No. 108 at 86:7–12 (Nordine).  His expert reports, co-authored with Mr. Matthews, evaluating the subject parcels were admitted into evidence, namely JX 26 (Appraisal Report, Stewart Property) and JX 27 (Appraisal Report, Newman Co. Properties).

[7] Mr. Matthews has a bachelor's degree in real estate from the University of Tennessee and holds several real estate appraisal certifications and licenses.  JX 26 at PLT 42; JX 27 at 101.

The government offered no valuation testimony in response.  Instead of calling expert witnesses to the stand, the government attempted to undercut Plaintiffs' experts' testimony through cross-examination and the testimony of Mr. Robbins, who discussed the possible uses of the former rail corridor by abutting property owners, like Plaintiffs.  *See generally* ECF No. 109 at 335:11–347:23 (Robbins).  Mr. Robbins confirmed that the paved trail itself is 14 feet wide, comprised of a ten-foot-wide paved walkway flanked by a two-foot-wide stone shoulder on each side.  *Id.* at 293:20–25.  Mr. Robbins also confirmed that the trail easement is 100 feet wide, extending 50 feet in both directions from the center line of the trail.  *Id.* at 294:1–6.  Altogether, the paved trail itself extends seven feet and the trail easement 43 feet further into each Plaintiffs' parcel, comprising a 50-foot-wide area in total and extending in length across the property line of each Plaintiff.

The Court finds that, because the government offered no expert testimony to the contrary and because Plaintiffs' experts gave credible, preponderant testimony, Plaintiffs' experts' methodology controls for calculating the just compensation owed for the land taken.  As explained at trial, Mr. Nordine began his appraisal of Plaintiffs' properties by taking property owner statements and cross-checking the information received from the owners with Google Earth images, county assessor records, the Indiana Sales Disclosure Database, FEMA flood maps, topography charts, and comparable sales in the area.  ECF No. 108 at 89:18–90:2; 119:5–8 (Nordine).

Mr. Nordine emphasized the use of comparable sales in appraising Plaintiffs' properties, stating that such comparable sales are the most relevant and indicative tests of actual property value.  *Id.* at 90:3–9.  A comparable sales analysis, as explained by Mr. Nordine, requires an appraiser to search county databases for relevant property sales data before and at the time of construction of the recreational trail to determine the property's best and highest use for valuation purposes.  *Id*. at 90:10–18, 92:17–22.  Calculating best and highest use, according to Mr. Nordine, is a four-step process to determine what is legally permissible, physically possible, financially feasible, and maximumly productive on each property.  *Id.* at 109:18–110:3.  To determine the market value of comparable sales and Plaintiffs' properties themselves, Plaintiffs' experts stated that they followed the valuation approach of the Uniform Appraisal Standards for Federal Land Acquisitions ("Yellow Book") by retrospectively measuring the before and after valuations of all properties.  *Id.* at 101:7–20.

Prior to discussing the before and after valuations of Plaintiffs' parcels in detail, the Court notes that Plaintiffs' experts accounted only for the land that makes up Plaintiffs' parcels without regard to any improvements.  According to Mr. Nordine, a "cost approach," which "looks at either the reproduction or replacement of [the] cost to build improvements," was not needed in

---

He is the founder of David Matthews Associates, a real estate appraisal firm that he sold to Mr. Nordine and two other former employees.  ECF No. 108 at 232:13–16 (Matthews).  The Court accepted Mr. Matthews as an expert in the valuation of the properties at issue and methodologies used to calculate those valuations.  *Id.* at 239:20–24.  His expert reports, co-authored with Mr. Nordine, evaluating the subject parcels were admitted into evidence, namely JX 26 (Appraisal Report, Stewart Property) and JX 27 (Appraisal Report, Newman Co. Properties).

11

appraising Plaintiffs' parcels because the taking did not involve improvements on the land.  *Id.* at 110:25–111:6 (Nordine); JX 27 at PLT 64 ("The remainder property must be valued as burdened by a recreational trail easement which requires a hypothetical condition.  There is no impact of this easement on the improvement, only to the land.").  This approach, according to Mr. Nordine, is most efficient in performing comparable sales analyses in rails-to-trails cases because it excludes irrelevant factors, such as improvement valuations, that are unaffected by the government's taking of land.  ECF No. 108 at 111:7–9.  Mr. Matthews agreed with this approach, adding that it is "real estate appraising 101" to determine the highest and best use of vacant land, without regard to improvements on such land.  *Id.* at 242:9–243:4 (Matthews).

Illustrative of this point is an example Mr. Matthews presented in which a partial taking only affected the land of a parcel containing a $100,000 improvement.  *See id.* at 254:14–21.  According to Mr. Matthews, because the taking would not affect the improvement, the improvement is valued at $100,000 in both the before and after valuation.  *Id.* at 254:14–17.  In the interests of simplicity, Mr. Matthews stated that appraising the difference in value of the land without regard to the $100,000 improvement is most efficient when that improvement's valuation remains constant despite the taking.  *Id.* ("Since the improvements were not damaged, not taken, there is no reason to add those back because it's—you know, if you put $100,000 in before and $100,000 in afterwards, why confuse everything?").  The government offered no contrary evidence or testimony at trial to show that a proper appraisal contemplates unaffected improvements, and, for this reason, the Court finds that Plaintiffs' experts' decision to exclude such improvements in their valuations to be both persuasive and uncontested.

Next, the Court turns to the experts' determination of the pre-taking market value.  Here, Plaintiffs' experts gave no consideration to the recreational trail; instead, they (1) contemplated a vacant lot with possible future reversion of the railway easement back to the landowner and (2) assumed the hypothetical condition that each landowner may use the whole of their parcels.  *See id.* at 101:13–20, 163:6–10 (Nordine).  To determine the post-taking market value, Plaintiffs' appraisers assumed that the trail easement had been granted, and the trail had been built.  *Id.* at 245:3–15 (Matthews).  In this "after" evaluation, Plaintiffs' experts treated the trail easement as a complete taking in fee simple of each landowner's property in the rail corridor.  *Id.* at 189:18–190:8 (Nordine).

The government offered no evidence to undercut Plaintiffs' experts' methodology, did not call any experts of its own to rebut Plaintiffs' experts' testimony, and failed to discredit Plaintiffs' experts' methodology during cross examination.  Instead, the government argued—for the first time in its post-trial brief—that Plaintiffs' experts' methodology is flawed because their appraisal reports do not contemplate the physical remnants of the railway in its valuation of the before condition.  ECF No. 114 at 6–7.  For this reason, according to the government, Plaintiffs' appraisal reports fail "to account for real world conditions" and are, therefore, "inconsistent with binding Federal Circuit precedent."  *Id.* at 7–8.  In particular, the government cites to *Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015), for the proposition that, to constitute proper appraisal methodology in the before condition, Plaintiffs' experts had to have considered the remaining tracks, railroad ties, and other physical remnants of the railway.  *Id.*

In *Rasmuson*, the Federal Circuit held that the "fair market value of [] land includes the physical remnants of the railway that would have remained on [a] landowner['s] property but for the issuance of [a NITU]." 807 F.3d at 1345. As the government correctly notes, the *Rasmuson* court found that "fair market value" would include the effect of the physical remnants of the railway, such as earthen embankments, railroad ties, and poor soil conditions, on the valuation of the land. *Id.*; ECF No. 114 at 7–8. Thus, as the *Rasmuson* court stated, "a 'before' calculation that does not take into account the costs of removing the physical remnants of the railway will result in an artificially inflated value and yield a windfall to the landowner." 807 F.3d at 1346 (citing *Olson*, 292 U.S. at 255).

But the *Rasmuson* court limited its holding, stating that such considerations of the physical remnants of the railway were appropriate because the railway companies in that case "did not have an obligation to remove the physical railroad construction features." *Id.* Additionally, because "there [was] no evidence in the record" that the railway companies at issue would remove such physical remnants, the landowners "would have regained possession of their land with the physical structures," had the trail easement ceased and the land reverted back to the landowners. *Id.*; *Loveridge v. United States*, 167 Fed. Cl. 44, 48 (2023) ("*Rasmuson's* holding followed from the nature of the railroad company's legal responsibility, reasoning that even absent the NITU, the railroad company 'did not have an obligation' to remove the physical encumbrance on the property owner's land." (quoting *Rasmuson*, 807 F.3d at 1346)). Therefore, for *Rasmuson* to apply, a party must establish that the railway company at issue is not under an obligation to remove the physical remnants of its railway upon abandonment. *See Loveridge*, 167 Fed. Cl. at 48.

Here, the problem with the government's argument is two-fold. First, the government's contention that Plaintiffs' experts deviated from "real world conditions" by failing to consider the physical remnants of the railway is simply an argument asserted by government counsel, as the Court received no expert testimony—or any evidence, for that matter—establishing that the "real world conditions" standard even applies. *See* ECF No. 114 at 7. Government counsel's allusion to that standard, without more, is inadequate. Furthermore, even if the "real world conditions" standard applies, what does and does not constitute "real world conditions" in the appraisal context falls squarely in the realm of expert opinion, not attorney argument. If the government wanted to advance an argument regarding valuation of the physical remnants of the railway, it should have elicited testimony or introduced other evidence establishing the foundation, context, and controlling standards of such argument. However, as mentioned above, the government did not call an expert witness, or even a fact witness, to testify on this topic. Without any supporting evidence, mere assertions by counsel cannot carry this argument to viability.

Second, setting aside the lack of supporting evidence, the government does not develop its argument under *Rasmuson*. Although the government is correct that *Rasmuson* is good law and that, in cases in which a railway company has no obligation to remove rail line structures upon abandonment, a proper before valuation should consider such structures, the government does not address whether INDR has any such obligation here. To fully develop its argument, the government had to have cited to an Indiana statute, a provision of a deed or easement agreement, or some other source of law to show that INDR was not obligated to remove the remnants of its railway. Although the Court recognizes the difficult nature of proving a negative, the

13

government did not even attempt in its one-paragraph argument on this point to address any such obligation or lack thereof.  *See* ECF No. 114 at 7–8.  It is established law that undeveloped or skeletal arguments are deemed waived.  *SmartGene, Inc. v. Advanced Biological Lab'ys, SA*, 555 Fed. App'x 950, 954 (Fed. Cir. 2014) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110, 129 (2022) ("The bottom line is that the government never meaningfully advanced [its] argument . . . .  Undeveloped or perfunctory arguments . . . may be deemed forfeited or waived.").  For these two reasons, the Court finds the government's argument regarding the physical remnants of the railway unpersuasive, and Plaintiffs' experts' appraisals remain unaffected by this eleventh-hour attack.[8]

The government also made another equally weak attack on Plaintiffs' experts' methodology at trial.  As established above, Plaintiffs' experts conducted a comparable sales analysis to calculate the amount of just compensation owed for each taking.  Although the government did not call any witnesses to rebut Plaintiffs' experts, government counsel attempted to discredit Mr. Nordine's conclusions by performing an online parcel search himself.  Government counsel informed Mr. Nordine that counsel was unable to locate certain parcels in Mr. Nordine's appraisal report and provided the Court with a binder of counsel's search methodology.  *See* ECF No. 108 at 223:7–9, 224:11–13 (Nordine).  Specifically, government counsel stated that he was unable to locate the 2021 tax records for the parcels in the comparative sales analysis located on E Gross Street by searching the addresses for those parcels on a website called Beacon.[9]  *See id.* at 222:1–223:12.  Mr. Nordine clarified by asking whether government counsel conducted this search in the year 2025, and government counsel confirmed that he did.  *Id.* at 224:17–22.  Mr. Nordine explained in response that these parcels were vacant in 2021 and, therefore, did not have a street address in that year.  *Id.* at 224:23–225:4.  This, according to Mr. Nordine, is the likely reason for government counsel's unfruitful search for records of the parcels from 2021: the issue was not that such records did not exist but that they did not have an address at that time.  *Id.*  Mr. Nordine further explained that if government counsel had searched by exact parcel code, rather than by address, counsel would likely have discovered the tax assessor information included in Mr. Nordine's appraisal report.  *Id.* at 225:5–17.  Additionally, Mr. Nordine noted that one typically conducts tax assessor searches for appraisal purposes through the Indiana Sales Disclosure Database rather than private websites, such as the one utilized by government counsel.  *Id.* at 222:23–223:6.  Government counsel asked a few follow up questions then discontinued this line of questioning.

As stated above, the Court finds Mr. Nordine's testimony to be persuasive, credible, and satisfactory to meet Plaintiffs' burden of proof.  A government attorney's inability to locate

---

[8] Additionally, as Plaintiffs noted in their closing argument, the government did not explain how, if neglecting to factor in the physical remnants of the railway was indeed an error at all, such neglect would undermine Plaintiffs' experts' appraisal methodology.  ECF No. 119 at 394:9–19.  As noted, the government did not present any evidence or call any expert witnesses at all, let alone an expert to specifically testify to, this alleged methodological misstep.  For this reason, and the reasons explained above, the government's argument regarding inclusion of the value of the physical remnants of the railway are unpersuasive.

[9] BEACON, https://beacon.schneidercorp.com (last visited Feb. 24, 2026).

specific real estate documents—particularly when that attorney searches with imprecise search terms—does not outweigh the testimony of an expert appraiser who is familiar with appraisals in the state of Indiana. Additionally, the binder containing government counsel's fruitless tax assessment searches offers little probative value, especially considering Mr. Nordine's testimony that the parcels lacked street addresses in 2021. What is more, this glancing attack by the government only addressed one of the six comparable sales offered by Plaintiffs' experts. The government did not offer its own comparable sales analysis or even attempt to discredit Plaintiffs' use of the other five comparable sales in Mr. Nordine's appraisal report. At bottom, because Plaintiffs' experts gave credible testimony and the government failed to discredit or otherwise damage the reliability of their conclusions, the Court adopts Plaintiffs' experts' methodologies for appraising the parcels at issue for just compensation purposes.

Having adopted Plaintiffs' experts' methodology, the Court now turns to their conclusions. From a total of 200 relevant comparable sales returned by his tax database search, Mr. Nordine selected six such sales based on the comparability of: the date of the sale; the location of the parcel; the size of the parcel; the zoning of the parcel; the shape and topography of the parcel; and whether improvements needed to be removed for a property analysis. *Id.* at 92:12–22, 114:14–116:13 (Nordine). Based on this comparable sales analysis, Mr. Nordine and Mr. Matthews concluded that Newman Co.'s properties are worth $85,000 per acre, *id.* at 116:14–21; JX 27 at PLT 59, 108; Bonny Orchard's property is worth $2,500 per acre, JX 26 at PLT 48; the Card and Stewart properties are each worth $4,000 per acre, JX 26 at PLT 7, 22, 51; and the American Legion's property is worth $3,000 per acre, JX 26 at PLT 49.

Plaintiffs' experts used a simple formula to determine the just compensation owed for the government's taking of the land underlying the rail corridor on each Plaintiff's parcel(s). Mr. Nordine calculated the value of the taken property by first multiplying the market price per acre of each parcel by the acreage of that parcel in the before state and the after state, and then he determined the net difference between the two values. *See* ECF No. 108 at 118:16–23, 120:1–11 (Nordine). According to the experts, the government took 2.755 acres of Bonny Orchards' land, valued at $2,500 per acre, amounting to $6,900 in compensation owed. JX 26 at PLT 48. The government took 1.422 acres of Mr. Card's land, valued at $4,000 per acre, totaling $5,700 in compensation owed. *Id.* at PLT 51. The government took 2.428 acres of Ms. Stewart's land, valued at $4,000 per acre, amounting to $9,700 in compensation owed. *Id.* at PLT 7. The government took 2.559 acres of American Legion's land, valued at $3,000 per acre, totaling $7,700 in compensation due. *Id.* at PLT 49. The government took 0.106 acres of Newman Co.'s storage unit parcel and 0.316 acres of Newman Co.'s strip mall parcel, both parcels valued at $85,000 per acre, totaling $9,000 for the storage unit parcel and $26,900 for the strip mall parcel. JX 27 at PLT 59, 108. Plaintiffs preponderantly established these figures with no rebuttal by the government; accordingly, the Court adopts these figures as the just compensation owed for the value of the land taken by the government.

### b.    Plaintiffs established that the easement taken is essentially exclusive.

As mentioned above, Plaintiffs' experts appraised the government's recreational trail easement as a fee simple transfer from each property owner to the trail operator. Plaintiffs accordingly argue that, although the government's taking here is an easement, "it is an exclusive

easement, so the landowner has no more rights to the land [taken] than the general public." ECF No. 115 at 13 (emphasis omitted). Because Plaintiffs have lost the ability to exclude others from the land taken, Plaintiffs, and their appraisers, contend that "the landowners retain no valuable property rights to the land in the After Condition" and, for that reason, must be compensated as if the government taking was in fee simple. *Id.*; ECF No. 108 at 103:2–13 (Nordine) ("[T]he easement is so restrictive that the adjacent owner effectively loses all valuable privacy rights, such as the right to exclude, and they would have [no more] rights than the general public. So it's akin to a fee simple take or 100 percent claim . . . ."); *see also* ECF No. 108 at 267:20–268:3 (Matthews) ("The public has the right to use the trail, and nobody is going to pay you for that. So there's no valuable property rights left for the land . . . you have the residue in fee simple title, but you have the easement and the easement area is worthless. You've taken rights.").

The government counters that the easement is non-exclusive by pointing to the language of the deed itself and Vigo County's policies and practices with respect to the easement. ECF No. 114 at 10–11. Specifically, the government points to Vigo County's trail use agreement, which states that the "County's interest in the corridor is 'subject to . . . all existing occupancies, encroachments, and servitudes'" and that "[the County] shall not at any time impair or interfere with the lateral or subjacent support of any properties, or improvements on, over or adjacent to the Easement, or otherwise damage the same in any way[.]" *Id.* at 11 (first quoting DX10 at US 744, then quoting DX10 at US 744–45). Regarding Vigo County's trail use policies, the government emphasizes that "Plaintiffs can use the corridor as they would typically use their backyard," such as for "cooking and gardening," and that Plaintiffs can even submit an application "to obtain permitting for new structures in the corridor." *Id.* at 12.

The Court agrees with Plaintiffs that the government's textual argument "overreads" the language of the deed. ECF No. 119 at 401:13–21. As Plaintiffs note, the deed expressly conveys "an exclusive surface easement located on the surface of [the] rail line," completely undermining the government's non-exclusivity argument. DX 10 at US 744; *see* ECF No. 119 at 400:24–401:5. Additionally, the deed's language subjecting the County's easement to "existing occupancies, encroachments, and servitudes," DX 10 at US 744, and prohibiting the County from interfering "with the lateral or subjacent support of any properties . . . adjacent to the Easement," *id.* at 744–45, does not appear to preserve Plaintiffs' exclusive right to use the portion of their property that is located in the rail corridor. Instead, this language seems to provide notice of the occupancies, encroachments, and servitudes that may limit the County's exclusive easement and the County's duty to not undermine lateral or subjacent support to neighboring properties by, say, excavation or construction. For these reasons, the government's contention that the deed language substantiates the non-exclusiveness of the county's easement is unpersuasive.

The government's argument is no more persuasive regarding its reference to Vigo County policies and practices. As is emphasized ad nauseum in first-year property law courses, property ownership constitutes entitlement to a constellation of rights often analogized to a bundle of sticks. Among this bundle of sticks are "the right to possess, the right to exclude, the right to alienate, the right to use, the right to enjoy the fruits or profits, and the right to destroy." JOSEPH W. SINGER ET AL., PROPERTY LAW: RULES, POLICIES AND PRACTICES 3 (7th ed. 2017) (citing Roscoe Pound, *The Law of Property and Recent Juristic Thought*, 25 A.B.A. J. 993, 997 (1939)).

16

The Supreme Court has made unequivocal that the right to exclude is one of "the most treasured" rights of property ownership, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982), and that "the right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property,'" *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179–80 (1979)). Given its fundamental importance, the right to exclude "falls within [the] category of interests that the Government cannot take without compensation." *Id.* at 151 (quoting *Kaiser Aetna*, 444 U.S. at 180 (alteration in original)); *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1358 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008) (finding a government taking where an agency destroyed a property owner's right to exclude). Indeed, one law professor has even argued that if you "[d]eny someone the exclusion right[,] they do not have property." Thomas W. Merrill, *Property and the Right to Exclude*, 77 NEB. L. REV. 730 (1998); *see also* 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *2 ("[T]he right of property [is] that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.").

It is beyond peradventure that the trail easement destroys Plaintiffs' right to exclude. The trail easement prioritizes use of the former rail corridor for hiking and biking activities and preserves the railroad's right of way to reactivate rail services in the future. *See* ECF No. 75 ¶ 7; JX 9 at STB 153; ECF 119 at 399:2–7. As Plaintiffs note, judges of this Court have found that "recreational hiking and biking trail use and preservation of the railroad's right-of-way for future rail service reactivation completely eliminate a Rails-to-Trails plaintiff's right to exclude." ECF No. 115 at 14; *see Howard v. United States*, 106 Fed. Cl. 343, 367 (2012) ("Although a theoretical possibility exists that the trail use could be permanently discontinued, the easement returned for railroad use, and then the railroad easement abandoned by the railroad under common law . . . there is no real prospect that the property owners will ever again have unencumbered use of their property.").

The government's argument that the easement is not taken in fee simple because Plaintiffs can make minor, incidental uses of the rail corridor is unavailing. Regardless of whether Vigo County policy allows for Plaintiffs to use the rail corridor as if it was property in their own backyards, *see* ECF No. 109 at 343:24–344:4 (Robbins), Plaintiffs no longer possess the right to exclude others. As the government argues, Plaintiffs could maintain a garden or host a backyard cookout in the corridor. *Id.* at 344:5–9. But the value of these activities is entirely diminished when Plaintiffs lack the ability to prevent trail-goers from trampling on their gardens or crashing their barbeques. Thus, while Plaintiffs may be able to in some sense make use of the corridor as if it were their own backyards, so can every user of the recreational trail. Simply put, Plaintiffs are without the most important right in making use of one's backyard—the right to exclude others from that space. For this reason, the fact that Plaintiffs could participate in minor, incidental activities within the corridor does not detract from Plaintiffs' loss of all valuable rights to that property. *See Hardy*, 141 Fed. Cl. at 16–17 ("[T]he court . . . concludes that plaintiffs have no remaining use of the land burdened by the trail easement that is not available to the general public . . . . Although plaintiffs may indeed have nominal property rights in the burdened land, those rights have no pecuniary value and thus cannot impact the just compensation analysis."). Moreover, to the extent that the government elicited testimony regarding the minor,

17

incidental uses that Plaintiffs could make of their properties despite the easement, the government offered no evidence regarding either the value of these incidental uses or what uses or restrictions the public and Vigo County would also have in the corridor. For example, could a member of the public have a picnic or barbeque in the corridor on Plaintiffs' land? Could Vigo County or a member of the public plant flowers along the corridor? The government did not come close to presenting evidence to address these questions and other related ones at trial, likely because of the absurdity of arguing that Plaintiffs' remaining uses of the corridor are anything more than illusory. Without the right to exclude, any minor, incidental use of the corridor by Plaintiffs lacks any real value.

The government also alluded to the fact that other property owners' pre-existing improvements located in the rail corridor would be permitted to remain there after completion of the recreational trail per Vigo County policy. ECF No. 109 at 344:10–345:5 (Robbins). However, the government failed to present any evidence that *Plaintiffs* own any such structures and, even if such evidence were presented regarding other property owners along the corridor, the government did not lay a proper foundation for its consideration, and it is, therefore, irrelevant. *See id.* at 345:25–348:2.

Conversely, Plaintiffs elicited credible testimony regarding future uses of the rail corridor that are no longer possible due to the easement. For example, Mr. Newman testified that, had there been no trail easement and he had the exclusive right to utilize the corridor space, he would have used the space to add additional units to his commercial storage facility, thereby allowing his company to sell more storage space and increase profits. ECF No. 108 at 31:17–32:9 (Newman). Mr. Newman also planned to utilize the space in the corridor surrounding a state-mandated retention pond to further improve the storage unit facility. *Id.* at 32:10–24, 71:10–23. As for the strip mall parcel, Mr. Newman stated that he would have used the corridor space to accommodate tenants' requests for additional storage space for their businesses. *Id.* at 35:20–36:10.

Therefore, because Plaintiffs have lost all valuable property rights to the land taken—including, most importantly, the right to exclude—and retain no rights to the land beyond those enjoyed by members of the general public, the government taking here constitutes what is essentially a 100 percent fee simple taking of Plaintiffs' reversionary interest, and just compensation must be paid accordingly.

### 2.    Compensation Owed for the Land Taken

As explained above, the parties agree that the government owes just compensation for the taking of each Plaintiffs' land to build the recreational trail at issue. Given the preponderant, sound methodology used to value and quantify the amount of land taken and the government's failure to refute any of Plaintiffs' appraisers' calculations of just compensation owed, the Court adopts Plaintiffs' appraisers' conclusions, *see* ECF No. 50 at 15–16, and accordingly finds that Plaintiffs are owed just compensation for the land underlying the easement as follows:

18

|  | Bonny Orchards | Card | Stewart | American Legion | Newman Co. Storage Unit | Newman Co. Strip Mall |
|---|---|---|---|---|---|---|
| Acreage before taking | 35.395 acres | 28.332 acres | 23.188 acres | 112.829 acres | 1.006 acres | 3.196 acres |
| Acreage after taking | 32.64 acres | 26.910 acres | 20.76 acres | 110.27 acres | 0.900 acres | 2.88 acres |
| Amount of taking | 2.755 acres | 1.422 acres | 2.428 acres | 2.559 acres | 0.106 acres | 0.316 acres |
| Price per acre | $2,500 | $4,000 | $4,000 | $3,000 | $85,000 | $85,000 |
| **Compensation owed** | **$6,900** | **$5,700** | **$9,700** | **$7,700** | **$9,000** | **$26,900** |

### 3. Cost to Cure

In addition to requesting just compensation for the portion of the rail corridor taken by the government, Plaintiffs argue that they are entitled to recover just compensation for severance damages in the amount of the cost to cure the effect of that taking on the remainder of their parcels. *See* ECF No. 50 at 15–16. Specifically, Plaintiffs argue that the security and privacy of the remainder of their parcels are compromised by the proximity of the recreational trail to their remaining property. *See id.* at 12–13; ECF No. 108 at 10:18–11:2. Plaintiffs' experts state that the cost to cure these security and privacy concerns is the construction of fencing to block trail users from trespassing and/or looking into Plaintiffs' properties. ECF No. 108 at 122:11–17 (Nordine), 246:21–247:3 (Matthews). Plaintiffs contend that just compensation would be incomplete without this fencing. *See* ECF No. 79 at 1 n.3, 2.

The government responds that, as a threshold matter, Plaintiffs have failed to "establish a diminution in value attributable to privacy and safety concerns." ECF No. 114 at 8. The government contends that "bare statement[s] in appraisals that the trail will 'increase[] pedestrian/bike traffic in close proximity to the side yard of the subject' does not establish a loss in value attributable to security" and that "[n]ot one appraisal, representative or non-representative, alleges proximity damages or asserts that privacy fencing is needed." *Id.* at 9–10 (first quoting JX 26 at PLT 26) (emphasis omitted). The cost estimate for fencing in Plaintiffs' experts' appraisal, according to the government, is for chain-link fencing, "which Mr. Nordine distinguished from privacy fencing at trial," further exemplifying Plaintiffs' failure to prove privacy concerns. *Id.* at 9.

As set forth above, before the Court can even consider awarding the cost to cure, the plaintiff must establish that this cost is "less than the outright diminution in its value uncured." *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614 (quoting *2.33 Acres of Land*, 704 F.2d at 730). The principle here is simple: no one builds a $15,000 fence solely to cure a $1,000 loss in value to their property; it would constitute economic waste if curing the lost value was the sole concern. Conversely, the government should not be forced to pay $15,000 in just compensation for a loss that can be cured by a $1,000 fence. The key issue is whether there is evidence upon which the Court can rely to determine the diminution, if any, in value.

Plaintiffs did not establish diminution in value to the remainder; therefore, they have failed to meet their threshold burden of proof to recover the cost to cure. In order to establish a diminution in value, Plaintiffs had to have presented a valuation of the properties in the before and after condition *without reference to the cost to cure. See id.* ("Plaintiff . . . must offer evidence that the *remainder* lost market value." (emphasis added)). Plaintiffs clearly provided before values for their properties. For example, for the Stewart property, Plaintiffs' experts valued the land at $4,000 an acre before the date of taking. *See* JX 26 at PLT 23 (showing the "Estimated Land Value Before Take"). However, Plaintiffs' experts also valued the land at $4,000 an acre after the date of taking. *See id.* at PLT 26 (showing the "Land Value After Acquisition Reflecting Residue Damage"). The only reduction in value Plaintiffs' experts point to in the after condition is a reduction that results from the cost to cure. *See id.* (listing only "Cost to Cure – Fencing"). In other words, Plaintiffs' experts determined that the before and after value for the Stewart land is the same, but, to calculate the after value, they subtracted the cost to cure from the land value.[10] But this is not how cost to cure damages are demonstrated. Rather, Plaintiffs' experts had to show a diminution in the per acre value of Plaintiffs' properties in the after state without regard to the cost to cure. Plaintiffs cannot recover their cost to cure if they fail to present evidence that the cost to cure "is less than the outright diminution in [their properties'] value uncured." *2.33 Acres of Land*, 704 F.2d at 730 (citing *United States v. Dickinson*, 152 F.2d 865, 870 (4th Cir. 1946), *aff'd*, 331 U.S. 745 (1947)).

When asked during closing argument why the $4,000 per acre valuation remained constant in the before and after conditions, Plaintiffs' counsel responded that the $4,000 per acre valuation in the after state already included the cost to cure. ECF No. 119 at 441:21–25 ("To the extent it's not clear, I do believe it's clear based on the report, but that's the process, where it's $4,000 in the after because the damages were mitigated with the fence."). Put differently, the $4,000 per acre valuation in the after state is comprised of the property at a value lower than $4,000 per acre plus the quantity and quality of fencing needed to bring the property value back up to $4,000 per acre. The obvious issue here is that the Court has not been presented with any evidence whatsoever to demonstrate what the diminution in value was after the taking but before the cost to cure is added in. Without knowing this figure, the Court cannot make the threshold determination that the cost to cure is less than the diminution in value. This is fatal to Plaintiffs' cost to cure argument.

---

[10] Plaintiffs' experts also presented constant per-acre valuations for each of the other Plaintiffs' parcels in the before and after states. *See* JX 26 at PLT 48 (valuing the Bonny Orchards property at $2,500 per acre in both the before and after states); *id.* at PLT 49 (valuing the American Legion property at $3,000 per acre in both the before and after states); *id.* at PLT 51 (valuing the Card property at $4,000 per acre in both the before and after states); JX 27 at PLT 74, 77 (valuing the Newman Co. strip mall property at $85,000 per acre in both the before and after states); *id.* at PLT 108 (valuing the Newman Co. storage unit property at $85,000 per acre in both the before state and after states).

20

In addition to failing to show a diminution in value in the after condition in the appraisal report, Plaintiffs did not elicit testimony from their experts establishing such a diminution.[11]  In fact, Mr. Nordine conceded that there is no after valuation without the cost to cure already built in.  ECF No. 108 at 164:23–165:3 (Nordine) ("Q. But as we said, the after, you do not have a cost—you do not have an appraisal without the fence, correct?  A. The after valuation is a single approach, so as a whole, there is one final conclusion, there isn't multiple conclusions.  So, no.").  But Mr. Matthews testified that, in contravention to Mr. Nordine's contention, including only one after valuation that includes the cost to cure constitutes improper methodology.  According to Mr. Matthews, the "proper way" to find the diminution in value in the after condition is to "value [the land] without the fence and then value because you need a fence, unless you just subtract the cost of the fence."  *Id.* at 265:19–21 (Matthews).  However, Mr. Matthews testified that Mr. Nordine "took a different tact on that, he said there's one after value . . . ."  *Id.* at 265:12–13.  Indeed, Mr. Matthews was asked directly by the government about this point: "[F]irst you need to appraise the property without the cure in applying a cost to cure, right?"  *Id.* at 265:5–6.  To which Mr. Matthews responded in the affirmative, *id.* at 265:7 ("Yeah, because there may not be a damage.").

Plaintiffs only addressed this issue twice in the testimony and other evidence offered at trial.  First, in the appraisal report that covers the two Newman Co. properties, Plaintiffs' experts state in a conclusory fashion that "[t]he loss in property value would be greater than the cost of the security fence."  JX 27 at PLT 76; *see also id.* at PLT 77 ("The loss in value to the residue without this fence would exceed the cost to cure.").  Although Plaintiffs' experts may believe this statement to be true—and, if true, it would support the payment of cost to cure damages— nowhere in their expert reports do they provide any sales comparison or other appraisal approach to support this otherwise naked assertion.  Moreover, neither this conclusory statement nor anything like it appears in the appraisal report appraising the values of the other properties at issue.  *See generally* JX 26; JX 27.  In short, these conclusory statements, offered in support of only two of the properties at issue, are insufficient to establish that the cost to cure does not exceed the diminution of the remainders' fair market values.

Second, during direct examination of Mr. Matthews, Plaintiffs came closest to establishing a diminution in value in the after condition without inclusion of the cost to cure.  Mr. Matthews testified that "from my experience, having done dozens of these things, you see damages typically in the probably 20 percent, 30 percent, sometimes higher, sometimes lower, on what the residue land is worth that's been damaged."  ECF No. 108 at 248:18–22 (Matthews).  But just as the conclusory statement discussed above was insufficient, so too is this imprecise testimony by Mr. Matthews.  Although a 20 or 30 percent diminution in the value of the remainder would exceed the cost to cure on all Plaintiffs' properties and thus permit recovery of

---

[11] Mr. Newman, Plaintiffs' only fact witness, testified to Newman Co.'s need for a fence, raising such need beyond the mere speculative level asserted by the experts.  *See, e.g.*, ECF No. 108 at 38:17–39:6.  Unfortunately, though, without a figure for the diminution in value of Newman Co.'s properties in the after state without inclusion of fencing costs, Newman Co. cannot recover the cost to cure.  Mr. Newman's testimony alone cannot remedy the experts' failure to provide such a figure.

21

the cost to cure,[12] Mr. Matthews was merely speculating regarding these percentages; moreover, he testified that such values are "sometimes higher, sometimes lower, on what the residue land is worth that's been damaged." *Id.* at 248:20–22. Some back-of-the-napkin math reveals that, if the diminution here is even slightly lower than 20 percent (as Mr. Matthews surmises is possible), the cost to cure would exceed the diminution to the remainder, thereby barring Plaintiffs from recovery. *See McCann Holdings, Ltd.*, 111 Fed. Cl. at 614 (quoting *2.33 Acres of Land*, 704 F.2d at 730). For example, if the diminution in value skewed downward slightly to 17 percent, Plaintiffs would no longer be able to recover the cost to cure.[13] Notwithstanding this hypothetical, Mr. Matthews' speculative testimony does not provide any definite figure to value the land in the after condition without the cost to cure. For this reason, the Court emphasizes that, even though this testimony is the closest Plaintiffs come to properly establishing an after valuation for cost to cure purposes, these statements are too indefinite to establish such value; therefore, the Court cannot rely on them to award cost to cure damages.

Setting aside the fact that Mr. Matthews does not provide a definite figure for this valuation, he states that the basis for his estimate is his experience in appraising. ECF No. 108 at 248:18–19 ("And from my experience, having done dozens of these things . . . ."). On this point and generally, the government argues that Plaintiffs' expert reports "contain no market study or other market data that supports using a diminished value attributable to privacy or security considerations—a required prerequisite for using fencing as a cost to cure." ECF No. 114 at 9–10 (emphasis omitted). The Court agrees.

Under Rule 702 of the Federal Rules of Evidence, an expert witness may give opinion testimony when four conditions are met—the expert's specialized knowledge: (1) helps the trier of fact to understand the evidence; (2) is based on sufficient facts or data; (3) is the product of reliable principles and methods; and (4) reflects a reliable application of the principles and methods to the facts of the case. FED. R. EVID. 702(a)–(d). Although an expert witness may generally rely on his experience, if he is "relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note to 2000 amendment. This is because the trial court's "gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).

---

[12] For example, factoring in a 20 percent diminution of the $4,000 per-acre value of the Stewart property, *see* JX 26 at PLT 26, there would be an $800 per acre diminution. The Stewart property in the after condition is 20.76 acres, *id.*, so the total diminution in value would be $16,608. Therefore, because Plaintiffs seek $14,800 in cost to cure, *id.*, which is less than the total diminution value of $16,608, Plaintiffs could recover the cost to cure. *See McCann Holdings, Ltd.*, 111 Fed. Cl. at 614 (quoting *2.33 Acres of Land*, 704 F.2d at 730).

[13] Factoring in a 17 percent diminution of the $4,000 per-acre value of the Stewart property, *see* JX 26 at PLT 26, there would be a $680 per acre diminution. The Stewart property in the after condition is 20.76 acres, *id.*, so the total diminution in value would be $14,116.80. Therefore, because Plaintiffs seek $14,800 in cost to cure, *id.*, which is more than the total diminution value of $14,116.80, Plaintiffs would not be able to recover the cost to cure. *See McCann Holdings, Ltd.*, 111 Fed. Cl. at 614 (quoting *2.33 Acres of Land*, 704 F.2d at 730).

"Experience alone cannot substitute for reliable principles" because the Court would then have "no basis upon which to verify or evaluate the accuracy or legitimacy of [an expert's] conclusion." *Boston Edison Co. v. United States*, 80 Fed. Cl. 468, 495 (2008) (citing *Zenith Elec. Corp. v. WH–TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005)).  In short, "nothing in either *Daubert* or the Federal Rules of Evidence requires a [trial] court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Here, Plaintiffs' experts rely solely on their experience to reach conclusions on a wide range of topics to which they testified.  For example, Mr. Nordine testified that, based on his experience, he estimated the width of the trail;[14] calculated damages and cost to cure;[15] concluded that the trail posed a security threat to Ms. Stewart's parcel;[16] and assumed that security would be a primary concern for property owners adjacent to the trail.[17]  Similarly, Mr. Matthews relied upon his experience, "having done dozens of these things," to estimate the diminution in value to the remainder in a typical rails-to-trails case, ECF No. 108 at 248:18–24 (Matthews), and to decide to not conduct a proximity analysis for some properties, *id.* at 257:2–5 ("I don't think there's a need to do a proximity damage [sic].  Sometimes you've got to use your judgment and your experience.  You don't have to do a proximity damage study on every property.").

Seemingly recognizing this reliance on experience, government counsel asked Plaintiffs' experts whether market data played a role in coming to their conclusions.  When asked whether market data supported his opinion that the trail compromised the security of Plaintiffs' properties, Mr. Nordine stated that "[a]s far as specific market data, there wasn't a trail present, so[,] as of that date, [ ] there wouldn't necessarily have been the market data I think that [government counsel is] indicating."  *Id.* at 172:15–22 (Nordine).  Furthermore, Mr. Nordine explained that although the trail "can pose the possibility of a loss of privacy and security

---

[14] ECF No. 108 at 120:17–20 ("[W]hat's your basis for making the assumption [that trails are typically eight foot in width and paved without fencing]?  A. That would be based upon primarily [Mr. Matthews'] experience, but also my experience with the Rails-to-Trails process . . . .").

[15] *Id.* at 124:6–12 ("And stepping back more broadly as to damages and costs to cure, what was your basis for finding those applicable here?  A. Based upon our experience, David Matthews and myself, him having appraised in the Rails-to-Trails world for over, you know, 20, 25 years, and thousands of properties, myself now hundreds . . . ."); *id.* at 205:12–14 ("I'm saying that there is evidence that there would be potential damage from a—the presence of a trail, and it would be based upon our experience.").

[16] *Id.* at 147:8–15 ("[S]pecifically for Stewart, what are you basing those [security threat] conclusions on?  A. Again, the experience David and I both have, but also the fact that the trail does represent some level of threat, and with that potential for damage, and looking at the area, as you can see in the photograph from previously in the report, woven wire fence was already on the property.").

[17] *Id.* at 207:14–17 ("I mean, with 95, 99 percent certainty, you know, based upon applied or, you know, my own experience, but no, I did not talk directly to each owner and ask why they erected fencing.").

specifically, and then because of the characteristics of [ ] this property," he and Mr. Matthews did "not feel that the privacy was the main concern" for Plaintiffs here. *Id.* at 168:10–13.

Without a basis in market data or studies to back their conclusions regarding the value of the remainder vis à vis the cost to cure, Plaintiffs' experts' reliance on their own appraisal experience renders these conclusions of little probative value.[18]  The Court lacks the ability to "verify or evaluate the accuracy or legitimacy" of Plaintiffs' experts' conclusions given that Plaintiffs offer no market data on which this testimony can rely. *Boston Edison Co.*, 80 Fed. Cl. at 495.  For this reason, the Court must decline to simply take the experts' "word for it."  *See Daubert*, 43 F.3d at 1319 ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough." (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993))).

Putting aside the fact that Plaintiffs conceded that the reports lack a numerical figure for the after condition without the cost to cure,[19] Plaintiffs' experts' rationale in the appraisal reports for finding a diminution in value due to privacy and security concerns is unpersuasive.  Within the appraisal report, the experts state that "there is a loss of security" and that "[d]amage can accrue to a property due to a loss in privacy and security from increased pedestrian/bike traffic in close proximity to the side yard of the subject."  JX 26 at PLT 26.  Furthermore, the experts assert that "[t]he loss in value to the residue without this fence would exceed the cost to cure." JX 27 at PLT 77.  These statements are conclusory in nature.  They respectively conclude that there is a loss of security and privacy on Plaintiffs' property due to increased foot and bicycle traffic and that the legal standard for recovering the cost to cure is met, without any explanation or evidence.[20]  Just as courts need not consider conclusory arguments made by counsel or engage

---

[18] In addition to the lack of cited market data or studies, Plaintiffs' experts concede that they did not speak to Plaintiffs regarding their alleged privacy and security concerns.  ECF No. 108 at 207:9–11 (Nordine) ("I didn't speak to the individual owners of all those properties, although security would be a primary concern."), *id.* at 258:17–20 (Matthews) ("Q. Did you speak to any plaintiffs about whether there was proximity damage or they had issues with trespass?  A. No.").  This concession confirms that, to the Court's knowledge, Plaintiffs' experts have no basis, other than their experience, for the testimony given.

[19] At closing argument, Plaintiffs' counsel conceded that the reports do not include an after value without the cost to cure.  ECF No. 119 at 442:10–17 ("I agree there's no numerical spelling out of [the after condition without the cost to cure], I agree, as far as the report.  That is because when you hear Mr. Nordine testify about it, when you look at the available evidence, it's because it was obvious that the cost to cure was going to be less.  That was their determination.  That's what they made in there, that's what he explained."); *id.* at 444:6–10 ("Again, I agree with you, there's no numerical calculation of [the after condition without the cost to cure].  I don't think it's required here when they explained themselves very well about exactly why they made that determination, including specifically that issue.").

[20] Similarly, Plaintiffs' experts gave conclusory testimony at trial when asked on cross-examination about the cost to cure:

Q. Can you point, then, to where the market data is showing the loss of security in your report?  A. I think it's described.  Q. On what page, sir?  A. Under the cost to

with conclusory allegations set forth in a complaint, *see Celegne Corp. v. Mylan Pharms., Inc.*, 17 F.4th 1111, 1131 (Fed. Cir. 2021) ("[Plaintiff's] allegations in its complaint were conclusory and insufficient."), the Court need not consider conclusory expert opinions, *see ActiveVideo Networks, Inc v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) ("[T]he expert's testimony on obviousness was essentially a conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions.  This is not sufficient and is fraught with hindsight bias."); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's conclusory opinions are . . . inappropriate.").  Therefore, Plaintiffs' experts' conclusory statements are unpersuasive and need not be considered.

In sum, to recover the cost to cure, a plaintiff must show that the cost to cure is less than the outright diminution in value of the remainder.  Plaintiffs fail to make such a showing here because they do not provide an after value of the per-acre valuation of Plaintiffs' remainders.  Without this variable, the Court cannot determine whether the cost to cure is less than the diminution in overall value of the remainders.  Plaintiffs' reliance on their experts' experience and conclusory testimony, without market data to support such reliance, is unavailing.  Therefore, Plaintiffs fail to meet their burden, and the Court cannot award the cost to cure.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs are entitled to just compensation in the following amounts:

| | Bonny Orchards | Card | Stewart | American Legion | Newman Co. Storage Unit | Newman Co. Strip Mall |
|---|---|---|---|---|---|---|
| **Award Amount** | **$6,900** | **$5,700** | **$9,700** | **$7,700** | **$9,000** | **$26,900** |

cure.  Q. So what page are you looking at for that?  A. I mean, the cost to cure is on page 25.  It says, "Damage can accrue to the property due to the loss of privacy and security."

ECF No. 108 at 173:2–10 (Nordine) (quoting JX 26 at PLT 26; JX 27 at PLT 77).

The remaining issues in this case are attorneys' fees and amount of interest owed to Plaintiffs.  The parties **SHALL** file a joint status report **on or before March 20, 2026,** proposing a schedule for resolving those two matters.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
Zachary N. Somers
Judge

26